IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| JAMES HYLAND, | ) | CASE NO. 1:12-cv-02173 |
| | ) | |
| Plaintiff, | ) | MAGISTRATE JUDGE |
| | ) | KATHLEEN B. BURKE |
| v. | ) | |
| | ) | |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY ADMINISTRATION,[1] | ) | |
| | ) | **MEMORANDUM OPINION & ORDER** |
| Defendant. | ) | |

Plaintiff James Hyland ("Plaintiff" or "Hyland") seeks judicial review of the final decision of Defendant Commissioner of Social Security ("Defendant" or "Commissioner") denying his application for social security disability benefits. Doc. 1. This Court has jurisdiction pursuant to 42 U.S.C. § 405(g). This case is before the undersigned Magistrate Judge pursuant to the consent of the parties. Doc. 11. For the reasons discussed below, the Court **AFFIRMS** the Commissioner's decision.

## I. Procedural History

Hyland filed an application for Supplemental Security Income disability benefits on December 11, 2008. Tr. 73-74, 117-19. Hyland alleged a disability onset date of November 2, 2005. Tr. 117, 127, 144. He alleged disability based on epilepsy,[2] ataxia[3] and depression. Tr. 27, 73-75, 78, 82, 88, 144. After initial denial by the state agency on March 19, 2009 (Tr. 78-87) and denial upon reconsideration on November 30, 2009 (Tr. 88-94), Hyland requested a

---

[1] Carolyn W. Colvin became Acting Commissioner of Social Security on February 14, 2013. Pursuant to FED. R. CIV. P. 25(d), she is hereby substituted for Michael J. Astrue as the Defendant in this case.

[2] Hyland's first full or grand mal seizure was noted to have occurred in 2005. Tr. 259.

[3] Ataxia is the "failure of muscular coordination; irregularity of muscular action."  See Dorland's Illustrated Medical Dictionary, 31st Edition, 2007, at 172.

hearing (Tr. 95).  On April 27, 2011, Administrative Law Judge ("ALJ") Dennis LeBlanc conducted an administrative hearing.  Tr. 23-72.

In his June 7, 2011, decision (Tr. 7-22), the ALJ determined that Hyland had not been under a disability since December 11, 2008.  Tr. 18.  Hyland requested review of the ALJ's decision by the Appeals Council.  Tr. 4-6.  On July 18, 2012, the Appeals Council denied Hyland's request for review, making the ALJ's decision the final decision of the Commissioner.  Tr. 1-3.

## II. Evidence

### A. Personal and Vocational Evidence

Hyland was born on May 22, 1957.  Tr. 29, 117, 127.  Hyland has at least a high school education and completed some years of college.  Tr. 27, 28, 29, 151, 320.  He lives with his mother in her home.[4]  Tr. 28.  He is single and has no children.  Tr. 29, 290, 320.  Hyland last worked on November 2, 2005, and his past work includes work as a laborer for a party supply rental company[5] and as a landscaper.  Tr.  27, 145.   In 2005, he was laid off from his job at the party rental supply company.[6]  Tr. 33.  Following the layoff, during the 2005 Thanksgiving holiday, Hyland suffered a seizure and was not called back to work again.  Tr. 33.   Thereafter, he intended to go back to school to pursue a paralegal degree but never went back.  Tr. 35.

### B. Medical Evidence

#### 1. Opinions relating to Hyland's alleged mental impairments

---

[4] Hyland's mother is elderly but is mostly independent.  Tr. 28.  She generally does not require Hyland's assistance and Hyland has 11 siblings who come by and help out around his mother's house.  Tr. 28-29.

[5] Hyland's brother hired him at the party rental supply company.  Tr. 47. Hyland indicated that, notwithstanding his prior back injury, his brother was willing to hire him to work in the dish department area.  Tr. 47.

[6] The layoff was a seasonal layoff.  Tr. 33.

### a. Gary M. Echt

On October 16, 2010, Gary M. Echt, licensed professional clinical counselor (LPCC) and licensed independent chemical dependency counselor (LICDC), evaluated Hyland and prepared a report for Hyland's attorney.  Tr. 318- 23.  Mr. Echt evaluated Hyland "to help determine his ability to access Social Security benefits" (Tr. 318) and "to better determine his current mental state with regards [sic] to illnesses and past injuries that have left him  unable to work, and unable to adequately attend school to learn new skills." (Tr. 323).

After examining Hyland and administering the BDI-II (Beck Depression Inventory) and MMPI-2 (Minnesota Multiphasic Personality Inventory), Mr. Echt diagnosed Hyland with major depressive disorder and generalized anxiety disorder.  Tr. 323.  Mr. Echt also assessed Hyland with a Global Assessment of Functioning ("GAF") score of 55.[7]  Tr. 323.   In conclusion, Mr. Echt stated that it was his clinical opinion that "Hyland suffers from both a depression and generalized anxiety disorder that leaves him unable to adequately work in any kind of significant capacity."  Tr. 323.  Mr. Echt further indicated that Hyland's issues were "a direct result of both his illnesses and injuries." Tr. 323.

### b. J. Joseph Konieczny

On September 11, 2009, state agency consultative examining psychologist J. Joseph Konieczny, Ph.D., evaluated Hyland. Tr. 289-95.  As part of the evaluation, Dr. Konieczny performed a clinical interview and the WAIS – IV (Weschler Adult Intelligence Scale – IV) was

---

[7] GAF considers psychological, social and occupational functioning on a hypothetical continuum of mental health illnesses.  *See* American Psychiatric Association: *Diagnostic & Statistical Manual of Mental Health Disorders*, Fourth Edition, Text Revision.  Washington, DC, American Psychiatric Association, 2000 ("DSM-IV-TR"), at 34.  A GAF score between 51 and 60 indicates moderate symptoms or moderate difficulty in social, occupational, or school functioning.  *Id.*

administered.[8] Tr. 289. Dr. Konieczny diagnosed Hyland with cognitive disorder, not otherwise specified, and depressive disorder, not otherwise specified. Tr. 292-93. Dr. Konieczny noted that he did not have data regarding Hyland's level of functioning prior to his 2004 diagnosis of seizure disorder. Tr. 292. However, Dr. Konieczny opined that, given Hyland's "apparent educational and vocational history, it would appear that he has suffered from significant deficits in some of the nonverbal areas." Tr. 292. Dr. Konieczny also opined that Hyland showed no impairment in his ability to concentrate and attend to tasks or in his ability to understand and follow directions but did show moderate impairment in his ability to withstand stress and pressure and in his ability to relate to others and to deal with the general public. Tr. 292. Dr. Konieczny assessed Hyland with a GAF score of 54. Tr. 293.

    c. **Paul Tangeman**

On October 7, 2009, state agency reviewing psychologist Paul Tangeman, Ph.D., completed a Mental RFC (Tr. 297-300) and a Psychiatric Review Technique (Tr. 301-14).

In the "Summary Conclusions" section of the Mental RFC, Dr. Tangeman rated Hyland's mental abilities in 20 different categories. Tr. 297-98. In 15 of the 20 categories, Dr. Tangeman rated Hyland as "not significantly limited." Tr. 297-98. In the remaining 5 categories, Dr. Tangeman rated Hyland as "moderately limited," including: (1) the ability to carry out detailed instructions; (2) the ability to maintain attention and concentration for extended periods; (3) the ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; (4) the ability to interact appropriately with the general public; and (5) the ability to respond appropriately to changes in the work setting. Tr. 297-98. In the "Functional Capacity

---

[8] Julie Janco, MA, Psychology Assistant administered the WAIS-IV and Dr. Konieczny administered the remainder of the evaluation. Tr. 289.

Assessment," Dr. Tangeman noted that, although Hyland alleged disability based on his depression, Hyland had never been hospitalized for psychiatric reasons and had never participated in outpatient psychiatric or psychological treatment services. Tr. 299. Dr. Tangeman concluded that Hyland appeared capable of understanding and following instructions and concentrating and attending to tasks. Tr. 299. Dr. Tangeman noted, however, that Hyland's ability to relate to others was moderately reduced and he would do best in a work environment with minimal contact with others. Tr. 299.

In the Psychiatric Review Technique, Dr. Tangeman concluded that Hyland's mental impairments did not meet a Listing but found that Hyland had a cognitive disorder (Tr. 302) and a depressive disorder, not otherwise specified (Tr. 304). In terms of functional limitation ratings, Dr. Tangeman rated Hyland as having mild limitations in his activities of daily living; moderate limitations in maintaining social functioning and in maintaining concentration, persistence, or pace; and no episodes of decompensation. Tr. 311.

    2.    **Opinions relating to Hyland's alleged physical impairments**

        a. Eulogio Sioson

On March 4, 2009, state agency consultative physician Eulogio Sioson, M.D., examined Hyland and completed an evaluation. Tr. 259-66. When summarizing Hyland's medical history with respect to his seizures and back pain,[9] Dr. Sioson noted that Hyland was not formally treated for his seizures until he had a full or grand mal seizure in December of 2005. Tr. 259. As of the time of the evaluation, Hyland had been taking medication for his seizures and had not had another seizure since the December 2005 episode. Tr. 259. However, Hyland reported that he had been having ataxia and balance problems. Tr. 259. Dr. Sioson noted that, in 1999,

---

[9] Dr. Sioson also summarized Hyland's history of depression and noted that Hyland had not been treated for depression. Tr. 259.

5

Hyland was found to have fractured L1/L2 vertebrae with nerve damage.  Tr. 259.  Hyland indicated that he had constant pain in his legs, which affected his mobility and stamina, and he could not walk more than 40 minutes, needed a railing to climb steps, could stand for about 20-30 minutes and could sit for about an hour.  Tr. 259.  Hyland also indicated that he had been using a *non-prescribed* straight cane since about 2007.  Tr. 259.  Hyland was taking over-the-counter medication to help relieve his back pain and stiffness. Tr. 259.  He was able to do laundry, cook, clean, and do dishes but could not go grocery shopping because he could not walk and carry a load.  Tr. 259.

      Following his examination, Dr. Sioson offered the following opinions:

1. Seizures/back pains. He has history of non-specific seizure disorder with evidence of mild ataxia.  He had no apparent motor weakness or radiculopathy.  He had MRI of lumbar spine 6/12/07 that showed "remote L1/L2 compression fractures, no central compromise, moderate right and mild left neural foraminal encroachment L4/5."
2. Depression.  He was not emotionally labile and was able to maintain attention and concentration.
3. Except for pain limitation and above findings, neuromusculoskeletal data showed no other objective findings that would affect work-related activities such as walking, climbing, standing, carrying, lifting, handling, sitting and traveling.  Hearing and speaking should not be affected.

Tr. 260.

      **b. Cindi Hill**

      On March 19, 2009, state agency reviewing physician Cindi Hill, M.D., completed a Physical RFC.  Tr. 281-88.  Dr. Hill opined that Hyland could occasionally lift and/or carry 50 pounds; frequently lift and/or carry 25 pounds; stand and/or walk (with normal breaks) for a total of about 6 hours in an 8-hour workday; sit (with normal breaks) for a total of about 6 hours in an 8-hour workday; and, except for the lift and/or carry limitations, his pushing and/or pulling ability was unlimited.  Tr. 282.  Dr. Hill also opined that Hyland could frequently climb ramps

6

and stairs; could never climb ladders, ropes, and scaffolds; and, because of Hyland's history of seizures, he would be required to avoid all hazards such as machinery and heights. Tr. 283, 285. Dr. Hill found no manipulative, visual, or communicative limitations. Tr. 284-85.

Dr. Hill concluded that Hyland's allegations regarding his symptoms were credible in nature but his allegations as to the severity of his physical limitations were not fully supported by the objective medical evidence. Tr. 286. For example, Dr. Hill noted that Hyland's cane use was not noted by a treating source and objective medical test results did not support the need for a cane. Tr. 286.

### C. Testimonial Evidence

#### 1. Hyland's testimony

Hyland was represented by counsel and testified at the administrative hearing. Tr. 28-56. In 2008, when Hyland applied for disability, he was having issues with his legs. Tr. 33-34. He was unable to: finish walks that he started, stand for more than five minutes at a time, walk without a cane, or walk for more than ten minutes at a time. Tr. 34. He was also experiencing issues with his speech and his ability to chew. Tr. 34-35. He was continually biting his tongue and lip and he was later advised that he had ataxia. Tr. 34-35. Hyland was feeling fatigued throughout the day and had a lack of stamina. Tr. 36. Although he was not being treated for depression in 2008, he was also feeling depressed at that time. Tr. 36. The ALJ noted and questioned Hyland about the fact that, in his initial disability application, he did not list depression as a reason for his inability to work but later added depression as being a problem. Tr. 37-41. Hyland indicated that, in 2008, he was feeling helpless and frustrated and was more focused on trying to figure out what was wrong with him physically. Tr. 40-42.

In 1999, Hyland fractured his back and has continued to have problems from the bottom of his spine up through the top of the lumbar area of his back.  Tr. 47.  In the past, even with back problems, Hyland had worked but he stated that his back problems have worsened over time.  Tr. 49-50.  Hyland indicated that his pain is worse now, in part, because "fits of paralysis" had caused him to fall on multiple occasions.  Tr. 49-50.

His pain radiates through his legs into his feet.  Tr. 48.  He has a general stiffness throughout his body.  Tr. 47.   Hyland performs exercises at home that are designed specifically for his back.  Tr. 30.  In addition to doing exercises to try to relieve his back pain, Hyland tries to stay loosened up by going outside in warmer weather and he uses a massage chair two to three times each day.  Tr. 48.  Hyland's pain is worse if he kneels down or squats to try to get under a counter or in an enclosed area.  Tr. 49.  Additionally, he takes over-the-counter ibuprofen and naproxen.  Tr. 48.

Notwithstanding his back pain, Hyland indicated that he would be able to help with light household chores.  Tr. 50-51.  However, he reported that, because of his depression, he lacks motivation to do even simple tasks.  Tr. 51.

Hyland does not have health insurance.  Tr. 48.  His mother pays for his epilepsy medication.  Tr. 49.

Hyland does not drive.  Tr. 42.   When he was working, Hyland took the bus to get to work.  Tr. 45-46.  He indicated that he does not socialize[10] and, unless there is a prearranged appointment or a family gathering, he spends the entire day at home.  Tr. 42.  Hyland testified that he rarely goes shopping.  Tr. 54.  However, based on a function report completed by Hyland in 2009 (Tr. 165-72), the ALJ questioned Hyland regarding the truthfulness of his testimony regarding how frequently he shops (Tr. 54-56).  Following that exchange, Hyland admitted that

---

[10] Hyland indicated that he has friends but he does not see them very often.  Tr. 53.

8

he does still shop for toiletries at the pharmacy.  Tr. 55-56.   He watches television and reads the newspaper.  Tr. 43, 52-53.  He occasionally uses the computer to read the paper online.  Tr. 52.  He testified that he uses and has used a cane since April of 2007.  Tr. 43.  He does not always use his cane while at home but, if he leaves his house, he always takes his cane.  Tr. 43.

### 2. Vocational expert's testimony

Vocational Expert Nancy Borgeson ("VE") testified at the hearing.  Tr. 57-71.   The VE described Hyland's past work at the party supply rental company as a warehouse worker position.  Tr. 58.  The VE testified that the work was ordinarily classified as medium, unskilled.  Tr. 58.  However, she indicated that Hyland testified that he lifted up to 100 pounds and thus performed the position at the heavy exertional level.  Tr. 58.

The ALJ asked the VE to assume a hypothetical individual of the same age, education and work experience as Hyland who would be able to lift and/or carry 20 pounds occasionally and 10 pounds frequently; stand and/or walk for six hours in an eight-hour day; sit for six hours in an eight-hour day; occasionally able to climb but no ladders, ropes, or scaffolds; occasionally balance, stoop, kneel, crouch, and crawl; avoid hazards such as dangerous machinery or unprotected heights; unable to drive as part of the job duties; able to understand, remember and carry out non-detailed two to three-step instructions in a routine and repetitive work environment that does not require fast-paced production; and be limited to superficial interaction with co-workers and the public.  Tr. 58-59.  In response, the VE indicated that the ALJ's hypothetical described  light, unskilled work and that the hypothetically described individual would be able to perform the following unskilled jobs: (1) mail clerk (not in the post office) with about 1,400 positions available in Northeast Ohio, over 7,000 in the State of Ohio, and 139,000 nationally; (2) housekeeping cleaner with approximately 2,500 positions available in Northeast Ohio, over

12,000 in the State of Ohio, and 1,000,000 nationally; and (3) bench assembler with about 5,000 positions available in Northeast Ohio, 35,000 in the State of Ohio, and 289,000 nationally.  Tr. 59-60.

In response to a series of questions from Hyland's counsel, the VE indicated that, if an individual could stand and walk for less than four hours, only sedentary positions would be available. Tr. 60-64.  The VE also indicated that, with the addition of a sit/stand requirement, an individual would still be capable of performing light level work.  Tr. 64.  However, the VE indicated that, if the ALJ's first hypothetical was changed from being able to walk or stand to a stand/stand option, the housekeeping cleaner job would be eliminated but the mail clerk and bench assembler positions would still be available. Tr. 64-65.  The VE acknowledged that the DOT (Dictionary of Occupational Titles)[11] does not address a sit/stand option.  Tr. 65.  However, based on her expertise, she estimated that, with the sit/stand option, the number of available mail clerk and bench assembler position would probably be eroded by no more than 25%.  Tr. 65. The VE also indicated that, if the ALJ's hypothetical was changed from no fast-paced work to no production quotas, the bench assembler position and possibly the housekeeping cleaner positions might be partially eliminated as available jobs.[12]  Tr. 65-66.

### III. Standard for Disability

Under the Act, 42 U.S.C § 423(a), eligibility for benefit payments depends on the existence of a disability.  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which

---

[11] The Dictionary of Occupational Titles is published by the Department of Labor.  *See* 20 CFR § 404.966(d)(1).

[12] Hyland's counsel asked a series of questions with respect to the availability of jobs if the limitation regarding the ability to follow instructions was changed.  Tr. 69-70.  At first, it appeared that the VE was of the opinion that changing the two to three-step instruction limitation to a two-step instruction limitation would cause the jobs she listed not to be available.  Tr. 69-70.  However, the VE clarified that her answer was based on her opinion that it is very rare for there to be one-step jobs.  Tr. 69-70.  Accordingly, it is unclear whether a change from two to three-step instructions to two-step instructions would alter the VE's response to the ALJ's initial hypothetical.

can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).  Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . .

42 U.S.C. § 423(d)(2).

In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations.  The five steps can be summarized as follows:

1. If the claimant is doing substantial gainful activity, he is not disabled.

2. If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3. If claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, claimant is presumed disabled without further inquiry.

4. If the impairment does not meet or equal a listed impairment,[13] the ALJ must assess the claimant's residual functional capacity and use it to determine if claimant's impairment prevents him from doing past relevant work.  If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5. If claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. § 416.920; *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987).  Under this sequential analysis, the claimant has the burden of proof at Steps One through Four.  *Walters v.*

---

[13] The Listing of Impairments (commonly referred to as Listing or Listings) is found in 20 C.F.R. pt. 404, Subpt. P, App. 1, and describes impairments for each of the major body systems that the Social Security Administration considers to be severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience.  20 C.F.R. § 404.1525.

*Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the Commissioner at Step Five to establish whether the claimant has the Residual Functional Capacity ("RFC") and vocational factors to perform work available in the national economy. *Id.*

### IV. The ALJ's Decision

In his June 7, 2011, decision, the ALJ made the following findings:

1. Hyland had not engaged in substantial gainful activity since December 11, 2008, the application date. Tr. 12.

2. Hyland had the following severe impairments: remote status post-fracture of the spine and degenerative disc disease of the lumbar spine, seizure disorder, cognitive disorder, and depressive disorder. Tr. 12.

3. Hyland did not have an impairment or combination of impairments that met or medically equaled a Listing. Tr. 12-14.

4. Hyland had the RFC to perform light work except he was limited to only occasional climbing, stooping, kneeling, crouching, and crawling and he could not climb ladders, ropes, or scaffolds; had to avoid hazards; could not drive as part of his job duties; could understand, remember, and carryout two to three-step instructions; could perform routine and repetitive work not requiring fast-paced production; and was limited to superficial interaction with coworkers and the public. Tr. 14-17.

5. Hyland was unable to perform his past relevant work. Tr. 17.

6. Hyland was born on May 22, 1957, and was 51 years old, which is defined as an individual closely approaching advanced age, on the date the application was filed. Tr. 17.

7. Hyland has at least a high school education and is able to communicate in English. Tr. 17.

8. Transferability of job skills is not an issue in this case because Hyland's past relevant work is unskilled. Tr. 17.

9. Considering Hyland's age, education, work experience, and RFC, there are jobs that exist in significant numbers in the national economy that Hyland could have performed, including mail clerk (not in the post office), cleaner (housekeeping), and bench assembler. Tr. 17-18.

Based on the foregoing, the ALJ determined that Hyland had not been under a disability since December 11, 2008.  Tr. 18.

### V. Parties' Arguments

**A.    Plaintiff's Arguments**

Hyland argues that the Commissioner's decision should be reversed and remanded because the ALJ did not explain the weight assigned to the various medical sources as required by 20 C.F.R. §§ 404.1527 and 416.927.[14]  Doc. 12, pp. 5-7; Doc. 14.  In particular, Hyland takes issue with the ALJ's adoption of the opinion of consultative examining psychologist Dr. J. Joseph Konieczny, Ph.D., and rejection of the opinion of licensed professional clinical counselor and licensed independent chemical dependency counselor Mr. Gary M. Echt.  Doc. 12, p. 5-7, Doc. 14.  Hyland also argues that the ALJ's Step Five determination is not supported by substantial evidence because the ALJ's VE hypothetical failed to account for all of Hyland's limitations, including his use of a cane since 2007.  Doc. 12, pp. 7-8.

**B.    Defendant's Arguments**

In response, the Commissioner argues that Hyland's arguments are in essence an attack on the RFC and, since the ALJ's RFC is well supported by substantial evidence, reversal and remand is not warranted.  Doc. 13, p. 14.

The Commissioner also argues that the ALJ properly considered the opinion evidence in accordance with applicable regulations.  Doc. 13, pp. 15-17.  In arguing that the ALJ provided appropriate consideration and weight to the opinion of Mr. Echt, the Commissioner notes that Mr. Echt is a licensed professional clinical counselor and not an acceptable medical source under applicable regulations and that Mr. Echt saw Plaintiff only once.  Doc. 13, p. 15.  Further, the

---

[14] Plaintiff cites to 20 C.F.R. § 404.927.  Doc. 12, pp. 5-6.  However, the supplemental security income ("SSI") regulation that pertains to the evaluation of opinion evidence is 20 C.F.R. § 416.927.  The corresponding disability insurance benefit ("DIB") regulation is 20 C.F.R. § 404.1527.

13

Commissioner asserts that the limited weight that the ALJ provided to Mr. Echt's opinion is supported by the record. Doc. 13, pp. 15-16.

With respect to Hyland's argument that the ALJ did not properly account for his need to use a cane, the Commissioner asserts that the ALJ was not required to accept Hyland's subjective statements that he needed to use a cane and that the medical documentation fails to establish Hyland's need to use a cane. Doc. 13, pp. 17-18.

## VI. Law & Analysis

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record. 42 U.S.C. § 405(g); *Wright v. Massanari*, 321 F.3d 611, 614 (6th Cir. 2003). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989). A court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

**A.      The ALJ properly considered and weighed the opinion evidence.**

The Social Security Administration's Regulations provide rules regarding how to weigh "medical opinions." 20 C.F.R. §§ 404.1527(d), 416.927(d). As noted in the Regulations, "medical opinions" are statements from acceptable medical sources that reflect judgments about the nature and severity of a claimant's impairments, including symptoms, diagnosis and prognosis, what a claimant can still do despite his or her impairments, and a claimant's physical or mental restrictions. 20 C.F.R. §§ 404.1527(a)(2), 416.927(a)(2). An ALJ should also

consider opinions from "other sources" and generally should explain the weight provided to such "other sources." 20 C.F.R. § 404.1513; SSR 06-03p, *Considering opinions and other evidence from sources who are not "acceptable medical sources" in disability claims; considering decisions on disability by other governmental and nongovernmental agencies*, 2006 WL 2329939, *6 (August 9, 2006).

### 1. Gary M. Echt

Hyland's argument that the ALJ did not give proper consideration or weight to the opinion of Mr. Echt is without merit.

Mr. Echt was not a treating physician. Rather, Mr. Echt is a licensed professional clinical counselor and licensed independent chemical dependency counselor who saw Hyland only once for an evaluation.[15] As the Sixth Circuit has indicated, "[t]he treating physician doctrine is based on the assumption that a medical professional who has dealt with a claimant and his maladies over a long period of time will have a deeper insight into the medical condition of a claimant than will a person who has examined a claimant" only once. *See Kornecky v. Comm'r of Soc. Sec.*, 167 F. Appx. 496, 507 (6th Cir. 2006) (quoting *Barker v. Shalala*, 40 F.3d 789, 794 (6th Cir. 1994); *see also Daniels v. Comm'r of Soc. Sec.*, 152 F. Appx. 485, 490-91 (6th Cir. 2005) (indicating that, even where the ALJ had casually referred to a physician as a treating source, the treating source regulations did not apply to a physician's opinion where that physician had seen the claimant on only two occasions). The fact that the referral to Mr. Echt was "to help determine his [Hyland's] ability to access Social Security benefits" (Tr. 318) is an additional reason to conclude that he was not a treating source. Tr. 318. *See* 20 C.F.R. § 404.1502 (indicating that, if the claimant's relationship with an acceptable medical source is not based on the claimant's

---

[15] The parties argue over the relevancy of the fact that Mr. Echt evaluated Hyland upon referral from Hyland's counsel. However, the more relevant fact is that Mr. Echt saw Hyland only once.

15

medical need for treatment or evaluation but, rather, solely on the need to obtain a report in support of a disability claim, that medical source will not be considered to be a treating source). For the foregoing reasons, to the extent that Hyland argues that Mr. Echt was a treating source entitled to controlling weight, the ALJ did not err. Tr. 18.

Not only is Mr. Echt not a treating source, he also is not an "acceptable medical source." *See* 20 C.F.R. § 404.1513(a) (defining who are acceptable medical sources). Plaintiff first argues that the issue of whether or not Mr. Echt is or is not an "acceptable medical source" is not before this Court because the ALJ treated Mr. Echt as an "acceptable medical source." Doc. 14, p. 4. However, the ALJ did not identify Mr. Echt as an "acceptable medical source" and the ALJ did not refer to him as a doctor. Tr. 16. Alternatively, Plaintiff argues that Mr. Echt is in fact an "acceptable medical source." Doc. 14, pp. 4-6. He asserts that Mr. Echt is an "acceptable medical source" because he falls within the definitional section of 20 C.F.R. § 404.1513(a)(2). Doc. 14, pp. 4-6. That section provides that "acceptable medical sources" include:

> Licensed or certified psychologists. Included are school psychologists, or other *licensed or certified individuals with other titles who perform the same function as a school psychologist in a school setting, for purposes of establishing mental retardation, learning disabilities, and borderline intellectual functioning only*;

20 C.F.R. § 404.1513(a)(2) (emphasis supplied).

Hyland specifically relies on the above italicized portion of 20 C.F.R. § 404.1513(a)(2) to support his position that Mr. Echt is an "acceptable medical source." Doc. 14, p. 5. However, because Mr. Echt did not perform his evaluation of Hyland for the purpose of establishing mental retardation, learning disabilities, or borderline intellectual functioning and he did not perform the evaluation in a school setting, Plaintiff's reliance on that section is misplaced and the ALJ was

16

not required to evaluate Mr. Echt's opinion as an opinion from an "acceptable medical source."[16] Tr. 318-23.

Although Mr. Echt is not an "acceptable medical source," his opinion nevertheless is an "other source" opinion for which Social Security Ruling 06-03p provides guidance. *See* 20 C.F.R. § 404.1513(d), *see also* SSR 06-03p, 2006 WL 2329939, *6. As explained in SSR 06-03p, an ALJ "generally should explain the weight given to opinions from these 'other sources', or otherwise ensure that the discussion of the evidence in the determination or decision allows a claimant or subsequent reviewer to follow the adjudicator's reasoning." SSR 06-03p, 2006 WL 2329939, * 6. Consistent with the foregoing, here, the ALJ generally explained the weight he assigned to Mr. Echt's assessment. After considering Mr. Echt's assessment along with the other medical evidence, the ALJ gave considerable weight to the opinions of Dr. Konieczny and Dr. Tangeman, which reflected moderate symptoms and limitations, and found those opinions to be consistent with Mr. Echt's GAF assessment of 55. Tr. 16. Accordingly, the ALJ gave "Mr. Echt's assessment weight only to the extent that it is consistent with the medical record, as a whole." Tr. 16.

With respect to Hyland's argument that the ALJ improperly discounted Mr. Echt's opinion on the basis that Plaintiff did not seek or receive treatment for his depressive symptoms, Plaintiff's argument is unpersuasive for the following reasons. In reaching his decision and assessing the credibility of Plaintiff's statements, the ALJ properly considered Hyland's lack of treatment for his depressive symptoms. Tr. 13, 16. *See* 20 C.F.R. §§ 404.1529(c)(3)(v); 416.929(c)(3)(v) (indicating that treatment the individual receives is a relevant factor when

---

[16] Even if Mr. Echt was deemed to be an "acceptable medical source," the ALJ sufficiently explained the weight he provided to Mr. Echt's opinion and, as provided for in 20 C.F.R. §§ 404.1527(c) and 416.927(c), the ALJ took into consideration the consistency of Mr. Echt's opinion with the record as a whole. *See* 20 C.F.R. § 416.927(c)(4) (one factor to be considered when weighing opinion evidence is consistency of the opinion with the record as a whole); *see also Francis v. Comm'r of Soc. Sec.*, 414 Fed. Appx. 802, 804 (6th Cir. 2011) (noting that an exhaustive factor-by-factor analysis of the factors in 20 C.F.R. § 404.1527 is not required).

assessing credibility).  Social Security Ruling 96-7p, *Evaluation of symptoms in disability claims: Assessing the credibility of an individual's statements*, 1996 WL 374186, *3 (July 2, 1996).  The ALJ did not consider Hyland's lack of treatment for his depressive symptoms to be the sole determinative factor.  Tr. 13.  For example, while noting a lack of medical treatment for his depressive symptoms, the ALJ also noted that Hyland had reported to Mr. Echt that he had been "very active" with his brothers and sisters and had a "select group of friends that he has had since childhood that he considers a good support system."  Tr. 13 (referencing Tr. 320).  Additionally, the ALJ considered Hyland's lack of medical treatment in conjunction with multiple medical source opinions, concluding that Hyland's symptoms were moderate.  Tr. 16 (referencing Mr. Echt's GAF assessment of 55; Dr. Tangeman's opinion of moderate limitations in social functioning and concentration, persistence, or pace; and Dr. Konieczny's GAF assessment of 54).

Since the ALJ explained the weight provided to Mr. Echt's opinion and that explanation allows this Court to follow the ALJ's reasoning, Plaintiff's argument that the ALJ erred is without merit.  Accordingly, reversal and remand is not warranted.

**2.  Other opinions**

Plaintiff's argument regarding the opinion evidence appears to primarily relate to the ALJ's treatment of Mr. Echt's opinion.  In the context of that argument, Plaintiff makes reference to and takes issue with the weight the ALJ provided to Dr. Konieczny's opinion and generally argues that the ALJ failed to properly weigh the medical opinion<u>s</u>.  Doc. 12, pp. 5-6 (emphasis supplied).  However, Plaintiff does not fully articulate a basis for his claim that the ALJ did not fully explain the reasoning for the weight he provided to the other opinions,

including Dr. Konieczny's opinion.[17] Further, a review of the ALJ's decision shows that the ALJ sufficiently explained his reasoning. Tr. 16. Accordingly, to the extent that Plaintiff seeks reversal and remand for further articulation by the ALJ relative to other opinions, including Dr. Konieczny's opinion, Plaintiff's argument is not fully developed and waived and/or without merit.

**B.  The ALJ's hypothetical accurately depicted the limitations that the ALJ found to be supported by the evidence and the ALJ's Step Five decision is therefore supported by substantial evidence.**

Hyland contends that the ALJ relied upon and posed a hypothetical to the VE that did not accurately depict all of his limitations. Doc. 12, pp. 7-8. More particularly, he asserts that the ALJ should have accounted for his need to use a cane. Doc. 12, pp. 7-8. Hyland's argument lacks merit.

The ALJ considered Hyland's reported use of a cane but found his statements regarding the limiting effects of his alleged symptoms, including his claimed need to use a cane, not to be fully credible in that they were not supported by the medical record. Tr. 15-17. The ALJ therefore concluded that a light RFC was warranted. Tr. 15-17. The ALJ based his findings on a number of different factors, including objective medical tests showing "normal results" and/or "mild" to "moderate" findings, objective medical examination findings reflecting less severe symptoms than reported, and Hyland's use of exercise and over-the-counter medication to manage his pain. Tr. 15-16.

Moreover, in order "to find that a hand-held device is medically required, there must be medical documentation establishing the need for a hand-held assistive device to aid in walking or

---

[17] "[I]ssues averted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived." *McPherson v. Kelsey*, 125 F.3d 989, 995–96 (6th Cir. 1997) (internal citations omitted). "It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to . . . put flesh on its bones." *Id.*

standing, and describing the circumstances for which it is needed." Social Security Ruling 96-9p, *Determining capability to do other work—implications of a residual functional capacity for less than a full range of sedentary work*, 1996 WL 374185, *7 (July 2, 1996). However, Plaintiff has not identified medical documentation which establishes his need to use a cane. In addition, consultative examining physician Dr. Sioson noted in his March 4, 2009, report that Hyland had been using a *non-prescribed* cane since 2007 (Tr. 259) and state agency reviewing physician Dr. Hill noted that Hyland's use of a cane was not indicated by a treating source (Tr. 286).

In light of the ALJ's reasoned explanation for concluding that a light RFC is warranted and the lack of medical documentation to support Hyland's need for a cane, the ALJ's decision not to account for use of a cane in the RFC is not error. Furthermore, because the VE hypothetical upon which the ALJ relied adequately accounted for and incorporated the RFC limitations that the ALJ found to be credible and supported by the record, the ALJ's reliance upon the VE testimony in response to that hypothetical was proper and constitutes substantial evidence to support his Step Five determination. *See Parks v. Social Sec. Admin.*, 413 Fed. Appx. 856, 865 (6th Cir. 2011)(citing *Casey v. Sec'y of Health & Human Servs.*, 987 F.2d 1230, 1235 (6th Cir. 1993)) ("[h]ypothetical questions . . . need only incorporate those limitations which the ALJ has accepted as credible.").

## VII. Conclusion

For the foregoing reasons, the Court **AFFIRMS** the Commissioner's decision.

Dated: September 5, 2013

Kathleen B. Burke
United States Magistrate Judge

20